Case number 16-1416 et al. Genuine Parts Company petitioner v. Environmental Protection Agency. Ms. Stetson for the petitioners, Mr. Serino for the respondent. Good morning, Your Honors. May it please the Court, my name is Kate Stetson. I'm appearing this morning on behalf of both petitioners, AIMCO and Genuine Parts. This is also a CERCLA case. It's also about the hazard ranking system. It involves very different issues about hydrogeology and aquifers and groundwater flow. But it may be simplest to start with a more fundamental administrative procedure problem, and that is the EPA's complete failure to respond below to a number of significant pieces of evidence and comments in the record. And there's a very straightforward way to determine this. If you turn to EPA's brief at pages 29 to 39, these are the pages in the brief that purport to respond to each of the nine pieces of evidence that we identified below that counsel in favor of finding the two aquifers here not interconnected. There are nine different pieces of evidence. Pages 29 to 39 address each of those pieces of evidence. What you will not find in those pages is a single site to the record support document below showing where EPA responded to each of those nine pieces of evidence. What you will find instead is 10 pages of counsel argument, arguing with respect to other documents in the record why each of those nine pieces of evidence individually didn't amount to anything that EPA could or should have considered. That, of course, violates APA 101. EPA is required to respond not just to significant comments in the record, but also to evidence bearing on the issue before it. What do you think are your best arguments for showing that there was a confining layer or was not hydraulically interconnected? I mean, that's principally what we're talking about. We're talking about the two-mile area and whether there was a confining layer or whether they simply, the upper aquifer and the lower connected. That's correct. And you asked what the best evidence is for that? Yeah, what do you think your best arguments are? So let me make one adjustment to the question, if I could, which is remember that it's EPA's burden to show that the data establish interconnection. What I'm trying to say is what do you think are your best arguments in showing that EPA has not shown points of interaction? Sure. So to begin with, I think the best source for the kind of tightest summary of where all that evidence is is pages 249 to 251 of the joint appendix. And these are the comments into great detail about the evidence that a persistent sequence of clay, also called till, separates the upper aquifer from that lower limestone bedrock aquifer that EPA discusses. If you look at pages 25 to 35 of our brief, Judge Edwards, each of those pieces of evidence that I discussed is laid out seriatim in the brief. There are three geological surveys, three cross-sections, two well logs, and then a cross-section of well logs. So what is it that you think tells me that a till is a confining layer? I think you can look to EPA's own expert below. I thought they were arguing vigorously the opposite, that till is not a confining layer. So they have concluded that there is no confining layer. The issue about till versus clay, by the way, that the EPA is expressing some indignance about on appeal, first of all, the EPA's expert below, and you can look at joint appendix 415 to 417 for this, EPA's expert uses the same terms on those three pages. So let's set aside the nomenclature. Are they conceding that clay is a confining layer? Yes, they do concede that clay is a confining layer, as they must. Their own regulations, the table 3-6 in the back of the joint appendix shows that clay is a confining layer. EKI's comments also show in detail that the conductivity of these various sediments that we're talking about, clay versus limestone versus gravel, that that conductivity is the necessary two or more orders of magnitude apart that define something as a confining layer. Let me point you to JA591, reference 120, page 8. It doesn't look like there's any confining layer there, and as far as I can tell, this is not a contested exhibit. The glacier aquifer runs directly into the limestone aquifer. There's undifferentiated till, but it is not horizontally, it's not, that undifferentiated till is not going all the way across the disputed two-mile area to give you a confining layer. So this is the piece of evidence that we discuss in our brief that is labeled C to C prime, that bottom most component of the chart. We actually pointed this out in our brief, despite the fact that EPA didn't purport to rely on this particular exhibit below at all. It cites this page, but for a different proposition. That's true. And what we said in our brief to that is a couple things. The first is, for EPA to rely on that to establish that the aquifers are interconnected, it would also need to explain away, under the whole record rule, all of the countervailing evidence that we otherwise pointed to. But that even gets past the procedural point, which is that EPA never cited or relied on that one piece of evidence to support the conclusion that the aquifers are interconnected. What EPA failed to grapple with instead were all of the pieces of evidence, all of those geological surveys, cross-sections, showing that within that two-mile radius between the Eagle Creek and the White River, there is a confining layer of clay, call it clay till, call it till, call it anything that you wish, but the purpose of it and its activity is to confine the upper aquifer from the lower aquifer in that area. Now the problem as I look at that evidence, the problem with that is, that layer, and I'm looking at it the way you're looking at it, if you account for sea level and you look at the exhibits as carefully as you can, as best I could, it isn't clear that the horizontal reach is consistent or connected all the way across. And indeed, you point to that clay till layer, which doesn't appear to be connected all the way across, but I'm not sure, as being confining, and then there is an area just above that, which is not, and then there's another area just above that, which looks exactly the same, but you don't characterize it as I think there are, some of the exhibits that we pointed to, so some of the geological survey discussions, and I think one or two of the cross sections, contain a couple different things. One of them is some evidence that there is clay or till among that upper aquifer. That's irrelevant. We're not talking about that kind of depth. We're talking about something that's deeper. Then answer my concern on my question about how do you know, and I'm not sure, you may try to answer on burden of proof, but how do you know that that clay till line in that two mile area is connected all the way across, because it looks like when you look at the exhibits where they've tried to account for sea level, it does not look like it's continuous all the way across. Right, so a couple points. It may be continuous, but it isn't clear that it's connected. Yes, a couple points, though. The first is, yes, my first response would be on the burden. The second is, remember that those geological surveys talk about a thick, persistent sequence of clay in most places, separating the upper and the lower aquifers, so that's at least circumstantial evidence. The third point is, the point about elevation is an observation that EPA makes, again, just in its brief, no argument below about the difference in elevation suggesting that there is a difference in confining layers. Nobody is suggesting, and EPA can't suggest, that these confining layers underneath the ground have to remain at exactly the same elevation across one mile between these two relevant well lines. No, no, that's clear, and if they're arguing, that's silly, because all you're saying is that it can go up and down. Exactly. That's fine. Yes. That's not the question. The problem I have is it may go up and down, but then at a certain point, there's an opening. That's what you can't tell from the exhibits, so you have the clay and till going, and it's going up and down because of the elevations, but if you look at the exhibits, it's hard to know whether at a certain point there's an opening, and then clay and till continues, and then there's an opening. That's what's not clear. Well, I think you can tell from the exhibits that we pointed to. Which exhibit do you think best and clearly shows that? The cross sections. So if you look at cross section, we call it BB prime, which we discuss in our brief at page 29. This is joint appendix 624, and this is actually an EPA reference that it didn't discuss. Cross section 8J to 8J prime, which is the next page of our brief, and joint appendix 649, and then the third of the three cross sections is the plate R5 that EPA cited below. That's discussed in our brief at page 31. You can see it at joint appendix 378. The 8J, you're talking about the unconsolidated non-aquifer material? Yes. What do I do with that? It's labeled non-aquifer. What does that mean to me? I don't know what to do with it. What EPA says about that is that it equates it with sandy clay. So if you look at pages 35 to 31 of their brief, EPA says that this non-aquifer material, which logically shouldn't be an aquifer, is equivalent to sandy clay. And if you look at the hydraulic conductivity of sandy clay, you will find that it has a hydraulic conductivity of 10 to the negative sixth, which is two orders of magnitude at least more than the hydraulic conductivity of the aquifers that we're talking about. To your point, too, Judge Edwards, if you read across each of those cross sections, they may use, as I said earlier, different nomenclatures to describe the similar things, but you can tell, if you look at BB prime, that the confining layer of till, and there it's called pre-Wisconsin till. Our expert EKI at page 249 of our joint appendix equated that with clay, as do we. You look at the same finger-like layer in HAHA prime, and it's called non-aquifer material. You look at the same finger-like layer on that eastern slice that plate R5 shows you, and it's called clay till. So to your point, Judge Edwards, when we're looking just at that two-mile radius that our figures in our briefs depict with that horseshoe showing the relevant area, it is clear, we would say, from each of those pieces of evidence, supported by those geological surveys that talk about the persistent sequence of clay, supported by the well logs that show a persistent presence of clay in exactly the area that we're talking about, that each of those stacks up to signal that there is a persistent sequence of clay there. The problem that EPA has, again, is the fundamental administrative procedure problem. Not only that it doesn't have substantial evidence to support its conclusion that there was no clay there, that there was no confining layer, but that it didn't deal with each of these pieces of evidence as it was required to. If I could take one minute left and talk... We agreed with you on the latter point, that they didn't respond, that we wouldn't deal with the former point. Sorry, say again? If we agreed with you that they didn't respond adequately, we would not deal with your former point. You would not deal with the substantial evidence point if you conclude that they didn't respond, for the reason that the, what I mentioned earlier, the substantial evidence test requires that whole record approach. So if EPA didn't address conflicting evidence in the record, you can't just look at its evidence and make a conclusion up or down. They are two different EPA violations. Unless it were possible to determine that the material to which they didn't respond, that an agency didn't respond in a particular case, could not have affected the result. It is, I think... It simply isn't sufficiently material. Yes, I think it's hypothetically possible to imagine a piece of evidence or an insignificant or irrelevant comment that EPA didn't respond to, but it wouldn't make a difference. But here, the volume of evidence that it ignored, and it's essentially implicit acknowledgement in the brief that it didn't address those pieces of evidence below, because there isn't a single site to the record showing that they did. That's the fundamental problem EPA has, and I don't think that it's either dismissible or excusable by simply assigning each of these as being insignificant. If I could take two minutes and speak about the groundwater issue briefly. One minute because you're over, okay? Yes. One minute because you're over. Go ahead. Understood. The groundwater flow issue is a separate problem with the hazard ranking system, and this is, in this case, a fundamental clash with what CERCLA, particularly as amended in 1986, requires, which is even under the hazard ranking system, which you heard during the last argument is designed to be a quick assessment of risk. Even under the hazard ranking system, after 1986, Congress made it clear that the EPA has to use that system to the maximum extent feasible, as you said, Judge Ginsburg, to assess the risk associated with a particular project. And where you have, as here, evidence in the record that is conceded that groundwater flows away from the well fields that are of interest to EPA, EPA was not in a position to simply ignore away that evidence and to assign it zero significance in its calculus. Whether you look at it as a violation of the HRS or as a fundamental violation of CERCLA, EPA should not have listed this site when it knows that groundwater flows away from the major population that it had targeted during this site. All right, I'll give you a little time on the bottom. Thank you. Good morning, Your Honors. I may please the Court. My name is Paul Serino with the Department of Justice for the Respondent. I'm joined at Council table today by Eric Swenson of EPA. This case is about whether EPA reasonably listed the West Vermont groundwater contamination site on the national priorities list. Now, this is a site in Indianapolis where hazardous substances, including vinyl chloride and TCE, have seeped from two locations down into private drinking water wells and the groundwater, forming a plume of approximately 20 acres. Are any of those sites, those locations, south of the groundwater flow? The homes and so on that have been tested? Are they in the direction of the known groundwater flow? South, I think it is. You're asking me about the groundwater flow direction point? Yeah. Look, their expert says that it flows in the southeast direction. That's not away from the well fields to the east. In any event, there's insufficient information, either site specific or regionally about really where the groundwater direction flows, and that's the purpose of the next step, which is the remedial investigation feasibility study. Do you already have in hand any test wells from these homes that suggest it flows south? At the source, EPA considered the groundwater flow direction to attribute the contamination to the two sources. So, locally, yes. But, you know, so the HRS regulations properly provide that EPA should not consider groundwater flow direction on a site-wide basis to determine whether, you know, period. Did they say that explicitly, or is it that you should look at it? When the HRS was promulgated, the current version, 1990, this issue came up. And there were numerous commenters that said, you know, you should consider, EPA should consider groundwater flow direction when available in the hazard ranking system scoring. And the agency said, no, it's too complicated for this initial screening device. It didn't say that in the regulation. Just respond to the comments. That's not part of the regulation. That's correct. Okay, that's why your time on this argument doesn't work. I mean, it's not in the, there's no regulation that speaks to this precisely. Well, indirectly, the, instead of such a regulation, EPA included a weighting of population in the, of affected populations. It doesn't mean you couldn't consider groundwater flow at this point. There's nothing in the regulation that says you cannot. It does not factor into the analysis. I mean, so, a party can make the argument in any given case that you should have in that case. The regulation doesn't foreclose the argument. I'd like to, do you have more? I want to, I have a concern I want to raise with you. It isn't clear to me that the agency has given substantial evidence in this record with respect to hydraulic interconnection because it appears to me from the evidence in the record that the aquifers are separated by four orders of magnitude, not two as you claim. The conductivity on the outwash aquifer is, you can see, is 10 to the negative 6, and the conductivity of the limestone aquifer is, as I understand the record, 10 to the negative 2 because the limestone aquifer contains karst, and if you look at your regulation, if it contains karst, the conductivity measure is 10 to the negative 2. So, the level of magnitude, based on just what's in the record, and substantial evidence review, is whole record review. I'm doing whole record review. You're assuming it all the way through, and I don't see it. EPA did not rely on that line of evidence as part of its decision. You have to show. You have to address the issue of hydraulic interconnection. Let me show you how EPA did that, relying on four principal pieces of evidence. Now, it relied on a groundwater modeling report from the Indianapolis Water Company. No, no, let me tell you what, on page 25 in footnote 8 in your brief, you're acknowledging the conductivity of the glacial aquifer is 10 to the negative 6, and in your regulations, the limestone aquifer has to be measured at 10 to the negative 2 because your regulations, JA 73, and your brief at 25, indicate it includes karst, and if it includes karst, it's 10 to the negative 2, and that means that the magnitude is not within 2, as you suggest. I'm just looking at the evidence in the record, so there's no way you can get around that. That's there. Either there's a further explanation you haven't given, or you're wrong. Well, we haven't yet discussed well log 414789. Remember, the shale covers half the site, let's say. We're talking about a 2-mile radius. Shale covers half of it. It's EPA's view that the outwash aquifer sits directly atop the limestone bedrock aquifer. You still have to show they're not hydraulically interconnected. Well log 414789, which goes all the way down from the ground surface to the limestone bedrock aquifer, shows no confining layer. The confining layer is a different question. You have to show it's not hydraulically interconnected, and you rely on, as I understand your regulations, you rely on the measures of conductivity, and you say the measure of conductivity of the aquifer, the upper aquifer all the way down, is 10 to the negative 6. It now touches the limestone aquifer, which under your regulations with karst, is conductivity of 10 to the negative 2, and the magnitude, therefore, between them doesn't meet your regulations. Your Honor, EPA doesn't have the evidence, didn't collect the evidence, didn't do the analysis to do a site-wide… I'm not talking about site-wide. I'm talking within the areas in which we're talking about. So the answer to your question is you don't know. EPA did not develop that. So it would have to go back no matter what. It doesn't. Well, here's what I'm trying to—I'm going to let you answer it because I think I know what you're trying to say, but it isn't what the record suggests. Unless I'm misunderstanding, the hydraulic interconnection is separate from the question of confining layer. They can win on either one. My answer is, well, EPA— there's insufficient evidence about the hydraulic… No, no, no. Come on. Answer that first. Then I'm going to try to stay with you. They can win either way. They can show a confining layer, or they can show that the hydraulic interconnection is not what you say, which is a magnitude of two, and it looks to me like it's separated by four orders of magnitude. I don't think so. I think EPA… No, no, that's not my question. They can win on either one. Is that right? I disagree. They can't win on either one? I think if EPA shows a hydraulic interconnection based on substantial evidence, EPA wins. Right. And that's what I'm trying to do. Okay. I'm trying to show you that… But why won't you answer my question? They can win either way, right? That is a confining layer or your failure to show. I'm not saying you haven't shown it, or your failure to show the hydraulic interconnection. EPA did not base its conclusion on hydraulic conductivity. It did it based on a different line of evidence. So I think by raising that… We raised it in our brief to show that clay didn't mean till, and we used the conductivity as part of that argument. The EPA based its decision on the fact that shale goes halfway across the site while 414789 goes directly down to the bedrock and shows no confining layer at all. Thus, the aquifers are interconnected. In addition, within the upper aquifer, vinyl chloride has spread down 70 feet below ground surface. It has passed these clay patches that appear in some of the well logs. Note that that clay is not consistent. They're patches of clay, 414789. Where's the evidence you relied on to show that? We're diverting, but where's the evidence? Well, you can look at their own expert exhibit. Where's the evidence you relied on in response to that? I still want to come back to what we've been talking about. Their exhibit, I believe it's JA377. It's their well log chart that shows if you highlight the clay areas, there's no consistent, continuous layer across two miles. This and this doesn't even have 414789 because it wouldn't show any confining clay layer. So EPA went directly down and in at least one place found evidence or relied on evidence that had no confining layer until the bedrock. Plus the contamination is beneath the clay lenses, as they're called. So the hydraulic connectivity, it's an interesting side argument. It arose during the debate of whether clay is till. EPA did not rely on that. There's insufficient data on it site-wide. You can't make any conclusions about that here. EPA relied on more physical evidence from the well logs that take it directly down to the bedrock aquifer. That's what they're... So the four pieces of evidence were the water company report that concluded that it is likely that the limestone aquifer is hydraulically connected to the outwash sand and gravel aquifer. The same cross-section that you had pointed out earlier called C to C prime on page JA591, which also shows the upper aquifer directly on top of the lower aquifer. I would note on cross-sections, it's useful for broad features, major land features like where the shale ends and where the limestone bedrock is. It's not useful for more localized site-specific features. That's why the well log is critical. And that's on page 580, 581, 414789. It starts at the ground surface, goes all the way down 130 feet to the limestone, and there's no confining layer. This is 1 1⁄4 miles away from the site sources, showing in at least one place the aquifers are indeed interconnected. And finally, these clay patches, we know that's not confining. Because the vinyl chloride has gone beneath those features as well. So you're saying I should simply ignore what you have said in your materials with respect to hydraulic interconnection, that it was you're wrong facially, but it doesn't matter is what you're saying. Is that what you're saying? I would put it a little bit differently. I would say that you should... No, no, let me tell you what I think you said, which looks facially wrong if I understand the hydraulic interconnection. If the conductivity of the, and you said this, not me, I'm just reading your material, of the glacial aquifer is 10 to the negative 6, and you're effectively saying because of your regulations that the conductivity of the limestone aquifer is 10 to the negative 2, then the orders of magnitude are more than 2. You tried to argue that the orders of magnitude were within 2, so I read that and I say no they're not, based on what you're presenting. So I'm going with what you said, not what they said. And I want to be... And so now I want you to tell me what I'm supposed to do with it, just ignore that and say no, we threw that in for whatever it was worth? I think it was to illustrate the different porosity between clay and till layers. EPA did not rely on hydraulic conductivity as a basis for its decision here, did not. It relied on those other sources and the well log and the fact that the monochloride has seeped beneath the clay. That's the basis of EPA's decision, and I would respectfully argue that's a substantial evidence supporting the decision. All right. Regarding the comments not being responded to, I think EPA did a comprehensive response, and it's in the record in the support document. I'll just point the court to JA 155 to 157, which, if not addressing directly, certainly covers the points raised by the petitioners. With that, I see the time is expiring. I'd ask the court to respectfully... It's all in those three pages. Well, that's an example of EPA's response to the arguments raised by petitioners. It's just an example. Well, that's one section in a larger document, and I think it... Are there other examples? It's the entire support document. So we just have to scrounge through it? I was trying to point you to the section on aquifer interconnections. With that, we respectfully request that the petitions be denied. Thank you, Your Honor. Thank you. Three quick points, if I could. First, Judge Ginsburg, on your last question, I would actually point you to Joint Appendix 151 through 159, because those are the pages where EPA purports to address the comments that are received. But what I would also encourage you to do is to take a highlighter and strike out everything on those pages that is either a block quote from the guidance or the documentation record or a paraphrasing of the comments themselves. And what you are left with after that exercise is a handful of lines across a handful of pages making conclusory statements about EPA's conclusions on aquifer interconnection. Second, a point on the evidence. What you heard Mr. Serino argue were the four pieces of evidence that EPA purported to rely on below. What you didn't hear him argue was with respect to all of the other pieces of evidence that counsel in the opposite direction. As to those four, I would say this as to at least a couple of them. The fact that shale doesn't extend across the whole two-mile radius doesn't mean that clay isn't there, and that's the point. The fact that vinyl chloride penetrated to 70 feet below means that it penetrated the upper aquifer, because that's the depth that we're talking about. The statement at Joint Appendix 629 that it is likely that the limestone aquifer is hydraulically connected to the upper aquifer is followed by the next sentence. In other areas, the limestone aquifer is hydraulically isolated from the upper intertill aquifer system. The problem that EPA has then isn't just that it failed to grapple with all of that evidence. It's that it failed to carry its burden to show that the data established interconnection. And on your last point, Judge Edwards, about hydraulic conductivity, you are quite right that according to EPA in that footnote, one aquifer has a conductivity of 10 to the negative 6. The other has a conductivity of 10 to the negative 2 or 10 to the negative 4. If that's right, and we actually say that they've got the conductivity wrong, but if that's right, then they're confronted with two aquifers that actually operate as confining layers to each other because they are separated by 2 orders of magnitude. Well, that's the question I was trying to raise and I'm not sure I was understanding the answer. I was asking, and I'm curious of your view, there are two ways that you can win. Is that right? That is on the confining layer or by reference to the hydraulic interconnection? I think that is right. I think the way that both we and EPA have... I didn't read it all the way out in your brief either, but when I was going through the materials on the hydraulic interconnections, their numbers were not making any sense to me because they do show a magnitude of separation that's more than 2, based on what they're saying, or at least inconclusive. What I'm trying to understand is if I don't buy, if the court doesn't buy your argument on the clay being a confining layer, can you still prevail on these numbers? I think the short answer is yes. You have posited that there's actually a separate problem with the way that EPA has characterized those two aquifers. Right. I mean, it would seem bizarre to me as I was reading it because I don't wander into this area every day, thank goodness, but it didn't make any sense to me. Well, it... I will tell you that in our brief, in our reply brief, we actually resist this idea that the aquifer, the upper aquifer, has a 10 to the negative 6 conductivity, as EPA suggests. We point to pieces of evidence in the record that show that it doesn't. But if you take EPA at its word that one has a conductivity of 10 to the negative 4 or negative 6 and the other has, as you said, is limestone or karst, which means 10 to the negative 2, that's two orders of magnitude. The fact that they didn't... Mr. Serino said several times, we didn't rely on hydraulic conductivity to make this decision. That's an important element of determining whether something is or is not an aquifer or a confining layer. So if they didn't take hydraulic conductivity into account, that to us points up the fundamental problem again with the way that they went about this. They made conclusory statements based on a few pages of a few points of the record without grappling with all of the other pages pointing to those confining layers in the well logs of sandy clay, in the cross sections of the clay or till that demonstrate in that area that there is a confining layer present. Okay, before I lose the opportunity, if I may, at 151 to 155, would you just walk us through your best example of where there's no there there? I'd be happy to. So 151 to 155 is the beginning of the EPA's discussion of the aquifer interconnections, right? I call it aquifer delineation. So page 151 under 3.12, you can strike the first three paragraphs because those are just a recitation of the comments. You have eight lines at the bottom that constitute a response. Page 152 is in its entirety... Why is the response inadequate? Oh, the response is the conditions were appropriately characterized. The aquifers were documented to be interconnected. Therefore, these strata were considered one hydrological unit. That doesn't respond to evidence. It doesn't respond to specific comments. It doesn't respond to Joint Appendix 249 to 251, which was our experts' comments about all of the evidence supporting the conclusion that there is a persistent sequence of clay. If you turn to page 152, you can strike that entire page because that's just paraphrasing or block-quoting the HRS. Same with page 153. Same with page 154 until you reach the very bottom. As demonstrated in the documentation record, the EPA appropriately evaluated the conditions. Again, it's just this conclusory statements about what they did without actually engaging with the comments. Page 155, you can strike almost all of it, except, again, those few lines at the bottom. That's what I was saying by way of the fact that the fact that there's volume in this documentation or support record doesn't mean that there's substance. That's the problem. If I could make one last point on the groundwater flow, and it goes to Judge Edwards' question or comment about the regulation, you're exactly right. There isn't a regulation that precludes them from considering groundwater flow. In fact, what the regulation says, or the HRS, among other things, is you look to determine whether there is potential contamination. And if the groundwater flow evidence in the record that EPA conceded shows no potential for contamination, that should have been taken into account. That's another way to resolve this case. Thank you. Thank you. The case is submitted.
judges: Henderson, Edwards, Ginsburg